Filed 2/11/14  Ventura County Business Park v. Cal. Bank & Trust CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VENTURA COUNTY BUSINESS BANK, | B240430 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC399458) |
| CALIFORNIA BANK & TRUST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Mary H. Strobel, Judge.  Judgment is reversed.

Michelman & Robinson, Steven Casselberry and Stephen R. Isbell for Defendant

and Appellant.

Neufeld, Marks & Gralnek, Timothy L. Neufeld and Eva Wong for Plaintiff and

Respondent.

Ventura County Business Bank (VCBB) entered into a loan participation agreement with Alliance Bank (Alliance), whereby VCBB purchased a 49.4805 percent interest in a construction loan that Alliance had previously made to Silver Oaks Estates, L.P. (borrower). Alliance represented in the participation agreement that the loan was *not* in default. Unbeknownst to both VCBB and Alliance, however, at the time of the participation agreement, borrower was already in default on the underlying loan; it had violated a negative covenant in the loan agreement that prohibited borrower from further encumbering the loan collateral. Subsequently, borrower further defaulted on the loan by failing to make the necessary payments due under the loan agreement. When two loan extensions and an additional line of credit were insufficient to save the loan, and foreclosure was a certainty, VCBB attempted to rescind the participation agreement on the basis of mutual mistake of fact regarding the default existing at the time of the participation agreement. Alliance refused the request to rescind and VCBB ultimately brought suit for rescission. At this point, VCBB also argued that an additional ground for rescission existed – a mistake in the amount of the interest reserve for the loan. After a bench trial, the trial court entered judgment in favor of VCBB and Alliance appeals.[1] We conclude, however, that the participation agreement placed the

---

[1] While this action was pending Alliance was placed under receivership by the Federal Deposit Insurance Corporation (FDIC), which subsequently sold Alliance's assets to California Bank & Trust. Initially, California Bank & Trust argued that it had not assumed Alliance's liabilities with respect to this action, and further argued that VCBB must first exhaust its administrative remedies with the FDIC. California Bank & Trust has since withdrawn its exhaustion argument, and does not challenge the trial court's conclusion that it is liable for Alliance's actions in this matter. As such, for

risk of failing to discover the existing encumbrance on VCBB, not on Alliance. We

further conclude that the mistake regarding the interest reserve resulted in no harm to

VCBB. As a result, VCBB is not entitled to rescission as a matter of law. We therefore

will reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

1.    *The Underlying Loan*

In April 2006, Alliance issued a " 'term letter' " to borrower, indicating that it

would provide financing for phase one of a 21-unit residential subdivision borrower

sought to construct. The funds would be used to finish all 21 lots and construct 12 of

the homes. The borrower agreed to the terms  and Alliance began its underwriting

process.

A June 15, 2006 loan report prepared by Alliance indicated the following. The

property on which the subdivision would be built was located in Lancaster. Borrower

had purchased it in July 2005 for $840,000. Alliance would loan borrower $4,042,000,

which would include reimbursement of borrower's cash investment, the construction

costs, a loan fee, and an interest reserve of $213,275. As a rule, there is no source of

income to a borrower on a construction loan during the course of construction. As such,

lenders will roll into the loan an amount to pay the interest as it comes due during

---

clarity, we refer to Alliance as the party on appeal, even though the actual appellant is
California Bank & Trust, its successor in interest.

construction.[2]  In this case, the interest reserve was calculated based on a 12 month term and an interest rate of 9.5%.[3]  The loan report also indicated that, when phase two (the remaining nine houses) was to be constructed, the necessary loan amount would be $2,082,412, with an interest reserve of $109,280.

The construction loan agreement for phase one was ultimately entered into on July 14, 2006.  The loan amount was not to exceed $4,042,000, and would bear interest on the amount advanced from the date of the advance, with an initial interest rate of 9.25%.  The loan was secured by a deed of trust on the property on which the subdivision would be built.  Borrower was to provide title insurance showing that the deed of trust was, in fact, a valid first lien on the property.  Borrower did so; there is no dispute that Alliance's deed of trust was in first position.

Under the loan agreement, borrower made various covenants, including a promise not to "sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber" any of its assets.  Borrower also covenanted not to "[c]reate or allow to be created any lien or charge upon the [c]ollateral."  The loan agreement defined an

---

[2]  The amount of interest reserve is, of necessity, based on an estimate. Construction funds are not advanced all at once upon the execution of the loan, and interest is only charged on the amount advanced from the date of the advance. Moreover, the loan has a variable interest rate.  Both of these facts mean that the amount of the interest reserve may, or may not, be sufficient to cover the interest payments as they come due during the course of the loan.

[3]  The parties do not discuss the precise method used to calculate this amount.  If the entire $4,042,000 loan balance were immediately advanced, interest on that amount for the term of one year would be $383,990.  The amount of the interest reserve is approximately 55.5 percent of that amount, based, we assume, on estimates regarding the timing of the advances.

4

"[e]vent of [d]efault" as any failure to make any payment when due under the loan. It also constituted an event of default if borrower failed "to comply with or to perform any other term, obligation, covenant or condition" in the agreement.

The loan agreement also provided options for two three-month extensions, upon the payment of set fees. Extensions were to be granted "subject to Lender verification of sufficient interest reserve to carry the loan through the new maturity, that the loan is not in default and that no adverse material change has occurred in the project . . . . "

William Wolfson, a principal in borrower, guaranteed the loan. He had an adjusted net worth of $3.7 million, and liquid assets exceeding $500,000.

When the phase one loan closed, Alliance accidentally used the interest reserve amount of phase two, rather than that of phase one. Thus, the loan closing statement showed an interest reserve of only $109,280. This amount would prove inadequate.

2. *The Undisclosed Deed of Trust*

On September 15, 2006, two months after the Alliance loan closed, borrower signed a promissory note in favor of Gary Sacks in the amount of $297,820. This note was secured by a deed of trust on the property (hereafter the Sacks deed of trust). The note provided that it would be due at close of escrow[4] and would be paid prior to distributions to the partners who comprised borrower. The Sacks deed of trust, which was junior to Alliance's first deed of trust, was recorded on September 15, 2006.

---

**4**     Presumably, this meant close of escrow of the houses to be constructed and sold.

Borrower did not inform Alliance of this deed of trust.[5] It is undisputed that the recordation of the Sacks deed of trust constituted an event of default under the loan, as borrower had covenanted to not further encumber the collateral.

Moreover, this default was clearly material. The presence of this undisclosed second deed of trust could, conceivably, affect the marketability of the houses to be constructed. The parties intended that the houses would be individually marketed, not sold in bulk. Sacks could therefore interfere with the sale of each home, refusing to release his encumbrance until he was paid.

3.     *The Participation Agreement*

In January 2007, VCBB purchased a nearly 50 percent interest in the loan, by means of a participation agreement.[6] VCBB had previously participated in a number of loans with Alliance, and VCBB was being repaid on those loans.

There was much evidence introduced at trial as to the scope of VCBB's investigation of the loan prior to its execution of the participation agreement. Alliance

---

[5]     At trial, VCBB suggested that this deed of trust related to funds Sacks had contributed toward the initial purchase price of the property, and that Alliance had known of the debt and convinced borrower to delay recording the deed of trust until after Alliance's deed of trust had been recorded. The trial court concluded, in its statement of decision, that "[t]he evidence was inconclusive whether anyone . . . at Alliance knew of the recordation of the Sacks deed of trust . . . . " In other words, VCBB failed to meet its burden of proof on this issue.

[6]     In approving the loan, VCBB was aware that the loan violated three of its lending policies, but it approved exceptions. The loan exceeded the bank's policies for loan-to-cost ratio and loan-to-bulk-value ratio, and was under the bank's policy for the release price. VCBB was well within its rights to approve exceptions to its guidelines in order to approve the loan. We note these issues, however, because they indicate that there was very little margin for error in the loan.

6

supplied VCBB with numerous documents, which individuals at VCBB reviewed. For example, Alliance had obtained an appraisal of the project; VCBB had its own appraiser review and report on Alliance's appraisal. However, VCBB, as the participating bank, was prohibited from having direct contact with borrower. As such, the only financial information regarding the borrower and guarantor on which VCBB could rely was supplied by Alliance.

There are two facts which VCBB did not know when it entered into the participation agreement, which it now contends justify its rescission of the agreement: (1) the reduced amount of the interest reserve; and (2) the undisclosed Sacks deed of trust. As to the former, it is undisputed that VCBB could rely only on Alliance's information regarding the interest reserve; there was no other source of this information.[7] As to the latter, it is undisputed that, had VCBB obtained a current title report, it would have discovered the Sacks deed of trust.

---

[7]    It was, however, disputed whether Alliance had, in fact, given VCBB documents which indicated the reduced interest reserve. Alliance had given VCBB numerous documents in its file. While most of the documents indicated the higher amount of the interest reserve, one or two documents indicated the lower amount. There was no evidence at trial, however, indicating that VCBB had specifically reviewed any document showing the lower amount. We have some procedural concerns regarding this issue. VCBB never gave notice of rescission of the participation agreement on the basis of the reduced interest reserve; it did not allege the reduced interest reserve as a basis for rescission in its complaint. Instead, it first raised the issue of the reduced interest reserve in its trial brief. The parties, however, did litigate the issue at trial, without objection from Alliance. The trial court's proposed statement of decision provided that there was no evidence that Alliance told VCBB prior to the execution of the participation agreement of the reduced interest reserve. Alliance objected to the statement of decision, arguing that a data sheet showing the lower number had been part of a trial exhibit containing all of the documents given to VCBB for its review. The trial court then modified its statement of decision to state that the data sheet "was never

This much is clear: Alliance gave VCBB a copy of its preliminary title report, which predated the loan and was some six months out of date. Alliance also gave VCBB a copy of the title insurance policy which confirmed, correctly, that the Alliance deed of trust was in first position. Alliance did not obtain and give VCBB a current title report. VCBB did not ask Alliance to provide it with updated title information. VCBB's witnesses conceded at trial that VCBB could have obtained a current title report, for a "fairly nominal" cost, in 24 or 48 hours. It did not do so.

As we shall discuss, resolution of this appeal, with respect to the right to rescind for the mutual mistake regarding the existence of the Sacks deed of trust, will turn on whether VCBB bore the risk of the lack of current title information with respect to that deed of trust. There are several sections of the participation agreement which speak to this issue.

No fewer than five sections of the agreement provide that VCBB, as the participating bank, has performed its own independent investigation, with three of those sections specifically indicating that VCBB has investigated the *value of the collateral*. Section 1.3 provides, "Participant has reviewed the 'Loan Documents', and has made an independent investigation and evaluation of Borrower's financial condition and

specifically identified at trial" and that Alliance never elicited testimony on it. The court indicated that the document was first raised in opposition to the statement of decision, and concluded that, as there was no testimony regarding the document at trial, there was insufficient evidence that VCBB timely reviewed it. We have some concerns that Alliance's delayed focus on this data sheet may have been due, in part, to VCBB's delay in arguing that the reduced interest reserve constituted a basis for rescission. However, as Alliance does not argue that it was prejudiced by the delay, we do not pursue the issue.

8

creditworthiness, value of the 'Collateral' and the priority and validity of the lien encumbering the Collateral." Section 1.4 confirms, "As a result of Participant's independent investigation into Borrower's financial condition and Participant's determination of Borrower's creditworthiness and the value of the Collateral, the priority and validity of Seller's lien on the Collateral securing the Loan, Participant desires to purchase an undivided interest in the Loan on the terms and conditions hereinafter set forth." Section 3.6, subsection (ii) provides that Participant can terminate the agreement prior to funding if the seller[8] "has failed to provide Participant with information reasonably required by Participant to make an independent assessment of the Collateral, the viability of the Project and the creditworthiness of the Borrower." In section 3.8.1, participant represents and warrants that "Participant has based its decision to purchase its Participation Interest in the Loan solely upon Participant's own independent evaluation of the Borrower's creditworthiness, the existence, value, priority and enforceability of the lien on the Collateral and the viability of the Project, in reliance upon such information that Participant has deemed appropriate and without reliance upon any analysis or evaluation by Seller or Lead Lender." Section 4.7.4 begins, "Participant shall be deemed to have made its own independent investigation of

---

[8]     The participation agreement refers to Alliance as both the "Seller" and the "Lead Lender." The participation agreement was apparently a modified standard agreement, which provided, "The term 'Lead Lender' shall mean Alliance Bank, which may or may not be the same person as Seller." Presumably, the same standard form was used for instances in which the seller and lead lender were different entities, such as where a participating lender resells a portion of its interest to a third party. In this case, at oral argument, the parties agreed that where the participation agreement refers to "seller" *or* "lead lender," we should read the term as referring to Alliance.

9

the financial conditions and affairs of Borrower, and its own independent analysis of the Loan and the Loan Documents."[9]

As to Alliance's obligations, section 3.8.2 provides, "Seller has not made, and Participant has not relied on, any representation or warranty of any kind, whether expressed or implied, with respect to the financial condition of the Borrower, the value of the Collateral, the priority or enforceability of any lien on the Collateral, or the validity, collectibility or enforceability of the Loan, *except as otherwise expressly set forth in this Agreement.*" (Emphasis added.) Under section 3.7.5.1 of the participation agreement, the seller represents and warrants that, as of the effective date of the execution of the agreement, "[t]here are no events of default under the Loan and/or under any term, condition or covenant of the Loan Documents or any guaranty." Under section 3.7.5.5, seller further warrants, "Seller has no knowledge of any fact or circumstance that would give rise to an event of default under the terms of the Loan or

---

[9]   Evidence introduced at trial on the issue of whether VCBB should have obtained a current title report includes the following: (1) VCBB's own written lending policies and procedures, which require the bank to perform "the same analyses . . . on participating loans [as] for loans that are originated at this bank"; and specifically require the bank to "perform an independent credit analysis" and "an analysis of any collateral" on participating loans; (2) FDIC guidelines, which provide that a participating bank "must obtain all relevant credit information and details on collateral values, lien status, loan agreements and participating agreements" before agreeing to participate; and (3) testimony from VCBB's expert that VCBB performed a sufficient investigation and it was Alliance which should have obtained a current title report; but if he was entering into a participation agreement six months after the lead bank made its loan, he would ask the lead bank for a current title report, and if that bank would not supply him with a current title report, he would either decline the participation or obtain a current title report. In addition, we note that VCBB's appraiser's review of Alliance's appraisal included the following language: "A current title report was not provided for our review. This review is subject to review of a current title report for the subject property by qualified title personnel."

any Loan Document." In contrast with these provisions, however, section 4.7.3 provides, "Lead Lender does not warrant the collectibility or enforceability of the Loan or the value of the Collateral." Similarly, section 4.7.4 provides, "Lead Lender shall have no special duty to perform additional investigations or reviews of the financial condition of Borrower or the performance of Borrower under the terms of the Loan Agreement except as performed in the ordinary course of Lead Lender's day to day operations."

In any event, VCBB did not obtain a current title report. Both VCBB and Alliance apparently entered into the participation agreement without any *actual* knowledge that borrower was in default on the underlying loan. Unfortunately, the Sacks deed of trust transaction was only the beginning of borrower's defaults.

4. *The Project Is Not Timely Completed; Extensions are Granted*

The loan had been entered into on July 14, 2006, with a one-year term and two possible three-month extensions. By July 13, 2007, there were signs of trouble. The interest reserve had been fully depleted in May 2007, and there was over $64,000 in interest due. Borrower had also exhausted the construction funds, and was still short approximately $22,000. Only one of the constructed homes was in escrow. It was conceded that home sales in Lancaster had slowed, but borrower still believed the homes could be completed and sold within 120 days. Borrower obtained the first three month extension of the loan.

In September 2007, Alliance gave Wolfson, the guarantor, a $660,000 line of credit, secured by a third deed of trust on his home. The funds were to be allocated as

11

follows: $210,000 for construction costs; $400,000 for interest reserve; and $50,000 for extension fees/costs. On October 18, 2007, borrower obtained the second three-month extension. As a result of that extension, the loan was now set to mature on January 14, 2008.

By November 2007, it was clear that the loan was in trouble. The project was nearing completion, but there had been only "nominal" sales activity – a single home had been in escrow for a number of months, but the homebuyer was having trouble obtaining a lender. As to the instant loan, the Wolfson line of credit was being used to pay interest. Borrower sought an additional six-month extension on the loan; the remaining $336,000 available on the Wolfson line of credit would be sufficient to cover interest on the construction loan for that time. Alliance had, internally, downgraded the loan, but still believed there was sufficient value in the project for the loan to be repaid in full.[10]

5.      *VCBB Discovers the Undisclosed Deed of Trust*

Although VCBB was being paid its share of the interest due, thanks to the Wolfson line of credit, VCBB was concerned with the way Alliance was handling the loan. In January 2008, VCBB obtained its own appraisal of the value of the project. One section of the appraisal, entitled "Property Ownership and History" indicated

---

[10]      Alliance assumed a 20% price reduction in the sale price of the houses. Allowing for 5% marketing costs, this would result in $4,151,250 being realized. As the loan amount was $4,042,000, this would be just enough to pay off the loan, leaving the borrower $109,250. This would clearly be insufficient to cover the Sacks deed of trust, of which Alliance was still unaware, and would also not provide any funds to pay off the $660,000 line of credit encumbering Wolfson's home.

a "refi" on September 15, 2006, and a recorded deed of trust. VCBB's Chief Credit Officer, Charles Myers, admitted at trial that, when he received this document on January 9, 2008, he had knowledge of the Sacks second deed of trust on the property. At this point, Myers thought Alliance might have had knowledge of this deed of trust all along, and simply had not disclosed it; however, Myers never found any evidence that this was true.

The participation agreement provides that both lead lender and participant shall "promptly advise the other party as to the existence and nature of any fact coming to its attention which in its judgment impairs the security for the Loan or constitutes a default under the Loan Documents." Despite this requirement, VCBB did not inform Alliance of its discovery of the undisclosed Sacks deed of trust. Nor did VCBB attempt to rescind the participation agreement based on its discovery at this time.

6.      *The Loan Becomes Uncollectible*

In February 2008, Alliance categorized the loan as a "problem loan," and transferred its administration, internally, to Jeffrey Hamilton. On March 11, Alliance recorded a notice of default and election to sell; it filed a complaint seeking appointment of a receiver that same day.

7.      *Alliance Discovers the Undisclosed Deed of Trust*

A trustee sale guarantee is a title report obtained when a notice of default is recorded. Alliance obtained a trustee sale guarantee on March 11, 2008. The trustee sale guarantee reflected the existence of the Sacks deed of trust. On April 4, 2008,

13

Hamilton at Alliance telephoned Myers at VCBB, and informed him of the Sacks deed of trust.

8.      *Estimates of Recovery Further Decline*

On April 7, 2008, Hamilton wrote Myers, indicating a recent market survey would substantially drop the prices of the houses.  Gross sales proceeds were now expected to be only $3,023,880 or less.

9.      *VCBB Gives Notice of Rescission*

On April 8, 2008, by letter of counsel, VCBB gave Alliance notice that it was rescinding the participation agreement.  The letter began:  "You are aware of objections raised by VCBB to the manner in which Alliance has administered the Silver Oaks credit, including, but not limited to delays in beginning foreclosure, seeking the appointment of a receiver, and otherwise enforcing the loan agreement.  Alliance Bank has disregarded VCBB's demands for prompt action, even as the real estate market, and thus the collateral for the underlying loan, has deteriorated.  VCBB contends that Alliance Bank's conduct has breached Alliance Bank's implied covenant of good faith and fair dealing."  The letter went on to state that "recent developments indicate that Alliance Bank has breached the representations and warranties that it made in the participation agreement."  Specifically, VCBB argued that the existence of the Sacks deed of trust was an event of default, and Alliance had represented in the participation agreement that there were no events of default.  VCBB added, "Please note that the representation clause does not state that the representation is made to the best of Alliance's knowledge; it represents that there are no events of default."  Although

14

VCBB suspected that Alliance had known all along of the Sacks deed of trust, it took the position that its existence alone made Alliance's representation in the participation agreement false. This misrepresentation "whether unknowing, negligent or intentional" was argued to constitute sufficient grounds for rescission. VCBB stated that it would release its interest in the credit upon prompt restitution of all funds it had advanced.

On April 17, 2008, Alliance, by letter of counsel, rejected the request for rescission. Alliance took the position that VCBB had conducted its own due diligence and represented that it had done so in the participation agreement. Alliance argued that VCBB "would not be able to assert 'reasonable reliance' on any alleged misrepresentation or misstatement in light of their own due diligence."

Subsequently, VCBB confirmed its rescission. It further noted that any interest or further funds it received relating to its participation would be deemed an offset of the amounts it was entitled to receive as return of its investment upon rescission.[11]

10.    *The Property Is Foreclosed Upon*

A receiver was appointed on April 23, 2008. In July 2008, Alliance paid Sacks $47,500 to obtain a reconveyance of his deed of trust. Through a great deal of effort,

---

[11]    Alliance would nonetheless assert that VCBB's continued acceptance of payments under the participation agreement constituted reaffirmance of the contract and waiver of rescission. In this regard, we note that *Alliance*'s conduct after VCBB's rescission did not uniformly indicate a rejection of rescission. The participation agreement provided that if the lead lender obtained the property at a foreclosure sale, legal title shall be held "[i]n the name of Lead Lender for the benefit of Participant and Lead Lender." Yet when Alliance ultimately obtained the property in foreclosure, it took title in its name alone.

the receiver was able to sell 5 of the 12 constructed homes.[12] On January 9, 2009, Alliance foreclosed on the remainder of the collateral.

11. *The Instant Action*

On October 6, 2008, while the receiver was still attempting to sell the homes, VCBB brought the instant action against Alliance, seeking restitution following rescission.[13] The operative complaint is the second amended complaint, filed in January 2010. It pleaded causes of action for rescission, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation, constructive fraud, unfair business practices, breach of fiduciary duty, negligence, and declaratory relief.

Ultimately, the matter proceeded to trial on VCBB's causes of action for rescission, breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. The trial court would ultimately rule in favor of VCBB on rescission only; therefore, we limit our discussion to that cause of action.

12. *The Trial*

As to the claim of rescission, the trial focused on the two bases for rescission: the undisclosed Sacks deed of trust and the reduced interest reserve. VCBB proceeded

---

[12] The receiver testified that he lost seven sales in the fourth quarter of 2008, due to lending standards becoming increasingly tighter.

[13] The complaint was verified by Myers. It included an allegation that, when Hamilton had informed Myers of the undisclosed Sacks deed of trust in April 2008, it "was the first time anyone at [VCBB] was made aware of the such facts." This was untrue; Myers admitted at trial that he had knowledge of that deed of trust on January 9, 2008, when he learned of it in the appraisal report.

on a theory of mutual mistake of fact with respect to the undisclosed deed of trust  and failure to disclose the reduced interest reserve.

As to whether these two issues were material enough to justify rescission, VCBB elicited testimony from its witnesses that they would not have approved the participation agreement had they been aware of the undisclosed deed of trust or the reduced interest reserve.

Alliance took the position that VCBB was not entitled to rescind as, at the time it gave notice of rescission, it was itself in breach of the participation agreement. Specifically, Alliance argued that VCBB was in breach for *not* conducting an independent investigation as it represented it had, and for not informing Alliance of the Sacks deed of trust as soon as it had discovered it.

13.    *Statement of Decision*

The trial court found in favor of VCBB on rescission based on mistake or negligent misrepresentation, and awarded VCBB restitution of the funds it had advanced, plus interest from the date of rescission.  The court found in favor of Alliance on the remaining causes of action.[14]

The court concluded that VCBB performed an independent analysis of the loan based on the documents provided by Alliance, and that it was unaware of the Sacks deed of trust or the reduced interest reserve.  As to materiality, the court found credible the testimony of VCBB's president that VCBB would not have entered into the

---

**14**    We note that VCBB's cause of action for breach of contract did not fail for lack of proof of breach, but lack of proof of damages.

17

participation agreement had it been aware of the reduced interest reserve and the Sacks deed of trust. Additionally, the court found further evidence of materiality in (1) the inadequate interest reserve causing the borrower to default in May 2007 and (2) the fact that the Sacks deed of trust "further weakened equity in the property making VCBB's ability to receive what it had bargained for even less likely." Thus, the court concluded VCBB was entitled to rescission, based on mistake. Alternatively, the court concluded there was negligent misrepresentation with respect to the interest reserve and the undisclosed Sacks deed of trust.

As to Alliance's argument that VCBB had breached the contract by failing to independently investigate, the court concluded that VCBB did the typical investigation performed by a participating bank, as opposed to a lead bank, which was sufficient. The court noted, "While in hindsight it may have been prudent for VCBB to order an updated preliminary title report, the Court does not find that the terms of the loan agreement or any applicable FDIC guidelines unequivocally required VCBB to order a new preliminary title report when the one provided by Alliance was six months old." As to Alliance's argument that VCBB was in breach by not informing Alliance when it discovered the undisclosed deed of trust, the court stated[15] that it did "not find that any

---

[15] The court also stated that Myers "testified that he looked at the appraisal shortly after it was received but could not recall the date in relation to his subsequent conversation with . . . Hamilton in early April 2008." Having reviewed the reporter's transcript, we disagree with this description of the testimony. Myers agreed that he looked at the appraisal when he received it. He admitted that it disclosed the Sacks deed of trust, and answered "yes" to the question, "And so you had knowledge as of January 9th, 2008, that the Sacks deed of trust was an encumbrance on the property?" He was then asked if this was prior to the time anyone at Alliance said anything to him

18

delay in VCBB communicating to Alliance about the Sacks deed of trust constituted a breach of the participation agreement. VCBB thought Alliance already knew; further the length of the delay was not significant."

14.     *Judgment and Appeal*

On February 15, 2012, judgment was entered in favor of VCBB in the amount of $1,564,248.74. Alliance filed a timely notice of appeal.

## ISSUES ON APPEAL

On appeal, Alliance argues that the evidence established that VCBB breached the participation agreement by failing to conduct an independent investigation. We conclude that the issue of VCBB's investigation is relevant not to the issue of *breach*, but to the issue of rescission for mistake.[16] Specifically, a party is not entitled to rescind a contract for mistake when the agreement placed on that party the risk of the mistake. We conclude that the only reasonable way to interpret the participation agreement is that, while the trial court may have been correct that VCBB had no *express duty* to

about the Sacks deed of trust. He responded, "Well, my – you know, I'm not – I'm not sure on that. I – they may have said something to me prior to that. But I don't believe so. I think – I think this was the first – the first recognition of that in January, sometime in January." He was then asked if the first time "[t]hat the Sacks deed of trust was brought to [his] attention by Mr. Hamilton, or anybody on behalf of Alliance Bank, was on April 4th, 2008." He answered "Yeah" and then added, "I'm pretty sure that's accurate." While Myers did testify to some confusion as to whether someone at Alliance may have told him about the deed of trust prior to his April 2008 conversation with Hamilton (although he was "pretty sure" nobody did) he testified without ambiguity that he learned of the Sacks deed of trust from reviewing the appraisal on January 9, 2008.

[16]     At the time of oral argument, we gave the parties an opportunity to brief this issue.

obtain a current title report on the property, VCBB *assumed the risk* that a junior encumbrance had been recorded when it failed to fully investigate the issue.  Thus, VCBB is not entitled to rescind for the undisclosed Sacks deed of trust as a matter of law.

As to the issue of the reduced interest reserve, we conclude that VCBB has failed to establish that it was harmed by the interest reserve being less than VCBB believed it had been.  In order to establish a right to rescission, it is not sufficient for VCBB to establish that it would not have entered into the contract had it known the true interest reserve, it must establish that it was harmed by the interest reserve not being as represented.  As a matter of law, it has failed to do so.  Thus, the judgment cannot be supported on this basis.

## DISCUSSION

1.    *Standard of Review*

"Our review of the judgment is conducted in view of the trial court's issuance of a detailed statement of decision . . . .  When reviewing a judgment based on such a statement of decision, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'  [Citation.]  The ultimate facts found in the court's statement of decision necessarily include findings on the intermediate evidentiary facts that sustain them.  [Citation.]  [¶]  Although the statement of decision reveals the basis for the judgment, all of its reasoning is not treated as binding on an appellate court.  [Citation.]  To the extent the record presents an undisputed or established set of facts, the interpretation

and application of a statutory scheme to those facts are treated as questions of law and are subject to de novo review on appeal.  [Citation.]"  (*Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385, 1407.)

2.      *Rescission for Mistake*

A party may rescind a contract if "the consent of the party rescinding . . . was given by mistake . . . . "  (Civ. Code, § 1689, subd. (b)(1).)  "Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:  [¶]  1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [¶]  2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."  (Civ. Code, § 1577.)  The issues in this case involve both a mutual mistake of fact (the lack of knowledge of the undisclosed Sacks deed of trust) and a unilateral mistake of fact (the reduced interest reserve).

2.      *VCBB Cannot Rescind for Mutual Mistake Regarding the Sacks Deed of Trust as it Bore the Risk of that Mistake*

When a party seeks rescission for a unilateral or mutual mistake of fact, the rescinding party must establish that it did not bear the risk of the mistake.  (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 282; *Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 885; Rest.2d Contracts, § 152.)  "A contracting party bears the risk of a mistake when the agreement so provides or when the party is aware of having only limited knowledge of the facts relating to the mistake but treats this limited knowledge as sufficient."  (*Grenall v. United of Omaha Life Ins. Co.* (2008) 165 Cal.App.4th 188,

21

193; Rest.2d Contracts, § 154.)  An illustration in the Restatement Second of Contracts demonstrates the principle.  "A contracts to sell and B to buy a tract of land.  A and B both believe that A has good title, but neither has made a title search.  The contract provides that A will convey only such title as he has, and A makes no representation with respect to title.  In fact, A's title is defective.  The contract is not voidable by B, because the risk of the mistake is allocated to B by agreement of the parties."  (Rest.2d Contracts, § 154, com. b, illus. 1.)

The instant case is almost, but not entirely, identical to the illustration quoted above.[17]  Here, Alliance and VCBB contracted to share in the loan to borrower; both Alliance and VCBB believed the loan was not in default, but neither party made a current title search to confirm borrower had not further encumbered the property.  It turned out that the borrower had encumbered the property, and VCBB therefore sought to rescind.  The key issue before us is whether the risk of mistake was allocated to either party by the terms of the participation agreement.

In this case, there was no extrinsic evidence proffered regarding the parties' intent in executing the participation agreement.  As such, we interpret the contract de novo, as a matter of law.  (*Steller v. Sears, Roebuck & Co.* (2010) 189 Cal.App.4th 175, 185.)  "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  (Civ. Code, § 1638.)  " '[A] contract must be interpreted so as to give effect to the mutual intention of the

---

[17]    In this case, there was an express representation by Alliance that the loan was *not* in default.

parties, and the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'  [Citation.]" (*Gray1 CPB, LLC v. Kolokotronis* (2011) 202 Cal.App.4th 480, 486-487.)

We therefore turn to the language of the participation agreement.  The contract unambiguously, in no less than five provisions, required VCBB to perform its own independent investigation prior to entering into the agreement.  It specifically provided that VCBB was choosing to enter into the agreement *solely* as a result of VCBB's independent investigation into the facts, including the value of the collateral, and "without reliance upon any analysis or evaluation" by Alliance.  This language clearly and unambiguously provides that VCBB bears the risk that the collateral has a lesser value than VCBB believes, as a result of its investigation.

Against this language, VCBB relies on language indicating that VCBB may rely on representations expressly made by Alliance in the agreement itself, and Alliance's representation that, as of the effective date of the agreement "[t]here are no events of default under the Loan."  While that language appears to be unconditional, it cannot be read separate and apart from the rest of the agreement.  A later section of the agreement expressly provides that Alliance has "no special duty to perform additional investigations or reviews of . . . the performance of Borrower under the terms of the Loan Agreement except as performed in the ordinary course of [its] day to day operations."  Reading these sections together, it is apparent that, while Alliance represented that there were no events of default, it was making that representation based only the review it performed in the ordinary course of its day to day operations.  One

23

cannot read Alliance's representation that there are no events of default under the Loan as a representation that Alliance conducted a full and complete investigation of borrower's performance under every promise and negative covenant under the loan prior to executing the participation agreement; such an interpretation would read the language *limiting* Alliance's duty of investigation completely out of the contract.

In short, the contract provided that Alliance represented there were no events of default based on the knowledge it learned in the ordinary course of its operations, while VCBB represented it had independently investigated the value of the collateral. Thus, the contract placed the risk that the collateral was, in fact, impaired by an unknown second deed of trust squarely on VCBB. As VCBB bore this risk under the contract, it cannot rely on the fact that the risk came to pass as a basis for rescinding the contract.[18]

2. *VCBB Cannot Rescind for Mistake Regarding the Reduced Interest Reserve as it Suffered No Harm*

VCBB also sought to rescind because the interest reserve was lower than VCBB had believed it would be, based on the documents Alliance had provided. When a party seeks to rescind based on a unilateral mistake, it must establish that the mistake was material to the contract. "The mistake must be such that it animated and controlled the conduct of the party; go to the essence of the object in view and not be merely incidental." (*Reid v. Landon* (1958) 166 Cal.App.2d 476, 483.) "A contract is voidable for mistake only if enforcement would be materially harmful or more onerous to the

---

[18] Similarly, VCBB cannot rescind the contract based on negligent misrepresentation, as it was not reasonable for it to rely on the representation that there were no events of default; the representation was based on Alliance's knowledge from ordinary operations, and VCBB had the duty to conduct its own investigation.

24

party seeking avoidance than it would have been had the law or the facts been as believed. [Citations.] This is a necessary corollary of the principle that the mistake, whether of fact or law, must materially affect an essential element of the contract. [Citations.] A party seeking to rescind a contract must show that he has suffered material injury or prejudice although he need not show pecuniary loss. [Citations.]" (*Guthrie v. Times-Mirror Co., supra,* 51 Cal.App.3d at p. 886; see also *Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1098 [concluding that the fact that the rescinding party would not have entered into the contract had it not been mistaken is insufficient when there is no evidence that the mistakes increased that party's burdens].)

In this case, the trial court concluded the reduced interest reserve was material because: (1) VCBB would not have entered into the participation agreement had it known the reserve was reduced; and (2) the reduced reserve caused borrower's default in May 2007 when the reserve was depleted. The fact that VCBB would not have entered into the contract had it know the truth is not sufficient; VCBB must establish that enforcement of the participation agreement with the underlying interest reserve reduced would be more onerous than enforcing the agreement with the underlying interest reserve as VCBB thought it had been. We conclude that VCBB failed in this burden, as we now explain.

The interest reserve is simply a portion of the loan proceeds; that is to say, the interest reserve is not an amount in addition to the loan. VCBB believed the entire loan was for $4,042,000, with $213,275 of that amount allocated to interest reserve; as it happened, the entire loan was for $4,042,000, with only $109,280 allocated to interest

reserve.  In other words, VCBB believed that, out of an approximately $4 million loan, the amount set aside for interest payments was approximately $100,000 more than it actually was.[19]  But the $100,000 missing from the interest reserve was *still part of the loan*.  As such, the error in reducing the interest reserve in the amount of $100,000 resulted in an increase in the available construction funds by the same amount.

For this reason, the trial court's conclusion that VCBB was harmed because the reduced interest reserve resulted in a default in May 2007, when the interest reserve was depleted, is unsupported by the evidence.  Although the borrower had, in fact, depleted the interest reserve by May 2007, it is also clear that the borrower had depleted the construction funds by July 2007.  There is simply no evidence that, had the additional $100,000 been allocated to interest reserve rather than construction funds, the buyer would not have similarly defaulted in May 2007 by depleting the construction funds with the project unfinished.[20]  It was undisputed that, when the loan's initial term ended, the loan was depleted, and borrower needed an additional $64,000 for accrued interest and an additional $22,000 for construction expenses.  Had the interest reserve been as VCBB had mistakenly believed, borrower would have paid the interest, but would have been $122,000 behind on construction expenses.

---

[19]    To simplify the discussion, we use round numbers.

[20]    The loan agreement provides it is an act of default if construction ceases for more than 10 days for any reason.  It also provides that if construction ceases before completion, the lender may accelerate the indebtedness and enter possession to complete the work.  Further, it provides that if the lender determines that the amount of the loan fund is insufficient to complete the project, it may require borrower to deposit an amount equal to the deficiency.

On appeal, VCBB does not argue that it was harmed by the loan's default in May 2007, because it acknowledges that it was ultimately paid the accrued interest by means of the Wolfson line of credit. However, VCBB argues that it was harmed because the Wolfson line of credit itself negatively impacted the net worth of Wolfson, harming VCBB's ability to recover against Wolfson in his capacity as guarantor. Again, VCBB fails to establish that the Wolfson line of credit would not have been required had the additional $100,000 been allocated to interest reserve rather than construction costs. The $660,000 Wolfson line of credit was issued in September 2007. At that point, the funds were to be allocated as follows: $210,000 for construction costs; $400,000 for interest reserve; and $50,000 for extension fees/costs. Had the interest reserve been as VCBB believed, the same $660,000 line of credit would have been required, but it would have allocated $310,000 for construction costs and only $300,000 for interest reserve. The bottom line is that, by the time of the Wolfson line of credit, it was apparent that the initial $4 million was insufficient to complete phase one of the project; an additional $600,000 would be required. VCBB was harmed because the project had cost overruns and was not timely completed; it was not harmed because of a $100,000 error in the initial allocation of the $4 million.[21] As such, VCBB cannot obtain rescission on the basis of the reduced interest reserve.

---

[21]  In its brief on appeal, VCBB argues that "[t]he principal material harm remains that VCBB would have never entered into the Agreement had it known the true facts of the Loan, including but not limited to the fact that the interest reserve was $109,280 and that another $660,000 loan to the Guarantor would be necessary to carry interest payments through the Loan's maturity." VCBB has no explanation for how a $100,000 reduction in the interest reserve required a $660,000 loan to the guarantor.

*DISPOSITION*

The judgment is reversed.  Alliance shall recover its costs on appeal.


*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*



                                                CROSKEY, J.

WE CONCUR:



        KLEIN, P. J.



        ALDRICH, J.



28